**Joan MAERTIN, Executrix of the Estate of Lothar Maertin, et al., Plaintiffs,**

v.

**ARMSTRONG WORLD INDUSTRIES, INC., Defendant.**

**Civil No. 95–2849.**

United States District Court,
D. New Jersey,
Camden Vicinage.

April 29, 1997.

Adam M. Raditz, Law Office of David Gary Ginsberg, Mount Laurel, NJ, for Plaintiffs.

Nolan A. Atkinson, Kathleen P. Loughhead, Duane, Morris & Heckscher, Philadelphia, PA, for Defendant.

## OPINION

ROSEN, United States Magistrate Judge.

### INTRODUCTION

Presently before this court is the application of Adam M. Raditz, Esq., attorney for the plaintiffs, challenging the plaintiff's assertion of work product privilege which the court shall construe as a motion to compel production of documents, pursuant to Rule 37(a), Fed.R.Civ.P. After careful consideration of the parties, submissions, and for the reasons noted below, the plaintiffs' motion to compel shall be **DENIED.**

### I. FACTS AND PROCEDURAL HISTORY

In March 1995, the plaintiffs filed the instant product liability suit against defendant Armstrong World Industries, Inc., (hereinafter "Armstrong"), for alleged defects in the design of ceiling tiles installed in various areas of Burlington County Community College, (hereinafter "BCCC"). (Fifth Amended Compl. ¶ 3.) The fifty-five plaintiffs named in the complaint are present and former employees of BCCC and their spouses. They allege a variety of causes of actions allegedly arising from exposure to Polychlorinated Biphenyls, (hereinafter "PCBs"), a carcinogenic agent purportedly contained in Aroclor 1254, a fire retardant used in ceiling tiles placed on BCCC's campus. (*See* Fifth Amended Complaint.)

During the course of discovery, in response to document requests, Armstrong forwarded a privilege log to the plaintiffs identifying sixty-seven (67) documents purportedly protected by the work product doctrine, attorney-client privilege, or both. (Letter from Nolan Atkinson, Esq., attorney for Armstrong, to Judge Rosen, at 1 (Jan. 20, 1997)) (hereinafter "Def.'s Letter") The plaintiffs initially challenged the assertion of privilege regarding nineteen (19) of the documents in the log.

During a pre-trial conference call before this court on January 15, 1997, Armstrong agreed to turn over six (6) of the nineteen (19) challenged documents to the plaintiffs. After the court had agreed to perform an *in camera* inspection of the thirteen remaining documents, the plaintiffs then submitted a letter brief to the court challenging the privilege on *"all* documents contained in the defendant's log that are alleged to be privileged under the work product privilege." (Pls.' Letter Br. at 1.)

Although the plaintiffs are not challenging the defendant's assertion of the attorney-client privilege with respect to thirty-eight (38) documents, the remaining twenty-nine (29) documents are at issue. Armstrong asserts that the disputed documents are protected by the work product doctrine because they were created in anticipation of litigation with a number of agencies such as the New Jersey Department of Environmental Protection, (hereinafter "NJDEP"), the New Jersey Department of Health (hereinafter "NJDOH"), and the Environmental Protection Agency, (hereinafter "EPA"). (Def.'s Letter at 2.) These agencies were investigating the alleged exposure and contamination of the ceiling tiles, and on March 21, 1986, Armstrong was notified by the EPA and the NJDOH that Armstrong's ceiling tiles were in fact the suspected source of the alleged contamination. (Letter from Nolan Atkinson, Esq., attorney for Armstrong, to Judge Rosen, at 1–2 (Mar. 10, 1997)) (hereinafter "Def.'s March Letter"). Subsequently, the EPA and the NJDOH met with Armstrong and requested information regarding production and the extent of distribution of the ceiling tiles by Armstrong. (*Id.*) Pending the receipt of such information, Armstrong contends that there was a possibility of suit by the EPA and the NJDOH. Armstrong alleges that consequent to these investigations, it generated the purported privileged documents within a six-month period, from March 21, 1986 until September 1986.[1] (Def.'s March Letter at 1.) On June 10, 1986, the EPA instituted a civil administrative action against BCCC, pursuant to the Toxic Substances Control Act. (Def.'s March Letter at Ex. E.) BCCC sought indemnification from Armstrong and consequently, Armstrong became a party to subsequent settlement discussions between the EPA and BCCC. (*Id.*)

## II. DISCUSSION

### a. Applicable Law

The Federal Rules of Civil Procedure allow parties to "obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party ... if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1) (emphasis added).

The privileges referred to in Rule 26(b)(1) are those privileges embodied in Rule 501 of the Federal Rules of Evidence. Rule 501 states that the scope and application of any claimed privilege is governed by the common law, unless otherwise provided by the Constitution or federal statute.[2] In

---

1. Armstrong notes that one document may extend slightly beyond this six month period, namely a personal notebook kept during the investigation period and possibility to the end of 1986. Armstrong explains that because the entries are not all dated, it is not clear when the notebook ended. (Def.'s March Letter at 1.)

 Armstrong further asserts that the undated documents at issue are notes of meetings which

occurred between March 21, 1986 and September, 1986 and reflect events summarized in the dated documents. (*Id.*)

2. Fed.R.Evid. 501 states in pertinent part:

 Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority,

cases premised upon federal question jurisdiction, federal common law governs the evidentiary privileges, rather than state law. *Wm. T. Thompson Co. v. General Nutrition Corp. Inc.* 671 F.2d 100, 103 (3d Cir.1982); *Wei v. Bodner,* 127 F.R.D. 91, 94 (D.N.J. 1989). In cases where a district court is exercising diversity jurisdiction, the law of privilege which controls is that which would be applied by the courts of the state in which it sits. *Samuelson v. Susen,* 576 F.2d 546, 549 (3d Cir.1978); *In re Ford Motor Co.,* 110 F.3d 954, 964–65 (3d Cir.1997). However, unlike the attorney-client privilege, the work product privilege is governed, even in diversity cases, by uniform federal law embodied in Rule 26(b)(3), Fed.R.Civ.P. *United Coal Companies v. Powell Constr. Co.,* 839 F.2d 958 (3d Cir.1988). Accordingly, although here the jurisdiction of this court is premised on diversity, because the work product doctrine is at issue, federal law shall govern the present inquiry.

### b. Work Product Doctrine

 The work product doctrine, codified in Rule 26(b)(3), Fed.R.Civ.P., provides in pertinent part:

a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and *prepared in anticipation of litigation* or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other

representative of a party concerning the litigation.

Fed.R.Civ.P. 26(b)(3) (emphasis added). The work product doctrine provides an independent basis upon which litigants may rely for protection of an attorney's trial preparation thoughts and materials. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The doctrine seeks to enhance the quality of professionalism within the legal field by preventing attorneys from benefitting from the fruit of an adversary's labor. The timeless and oft cited statements of Mr. Justice Murphy in *Hickman* elucidate the fundamentals of the work product doctrine:

Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case as the 'work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and

---

the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceed-

ings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman*, 329 U.S. at 511, 67 S.Ct. at 393–94. The Supreme Court has described the doctrine as an "intensely practical one, grounded in the realities of litigation in our adversary system." *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). As reflected both at federal common law and in the Federal Rules, the work product doctrine provides qualified not absolute protection, which, like other qualified privileges, may be waived. *Id.* at 239, 95 S.Ct. at 2170–71.

█ The party asserting work product protection has the burden of demonstrating that the documents were "prepared in anticipation of litigation." *Conoco, Inc. v. United States Dep't of Justice*, 687 F.2d 724, 730 (3d Cir.1982). The lynchpin of work product protection lies in the deceptively simple phrase, "in anticipation of litigation." *See, e.g., United States v. Rockwell Int'l*, 897 F.2d 1255, 1266 (3d Cir.1990) ("The question whether a document was prepared in anticipation of litigation is often a difficult factual matter"); *Leonen v. Johns–Manville*, 135 F.R.D. 94 (D.N.J.1990) ("The phrase, 'anticipation of litigation' is incapable of precise definition").

█ To determine whether a document was "prepared in anticipation of litigation," the relevant inquiry is "whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1258 (3d Cir.1993) (citing *Rockwell*, 897 F.2d at 1266); *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir.1979). Moreover, "litigation need not be imminent ... as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *Rockwell*, 897 F.2d at 1266 (citations omitted). However, the mere possibility of future litigation is insufficient to meet the "in anticipation of litigation" standard. *Leonen*, 135 F.R.D. 94 (citations omitted) In *Leonen*, 135 F.R.D. at 97, the court distilled these various formulae into the conclusion that, "there must ... [be] an identifiable specific claim or impending litigation when the materials are prepared." (citations omitted). The work product doctrine clearly precludes the protection of documents created in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for any nonlitigation purpose. *Rockwell Int'l*, 897 F.2d at 1266.

In *Martin*, an employee complained to the Occupational Health and Safety Administration ("OSHA") about chemical emissions in her workplace. In response to the complaint, OSHA, unable to promptly look into the complaint due to backlog, directed Bally's to investigate the conditions. Due to a risk of claims from the affected employees, Bally's general counsel wrote an internal memorandum commissioning a consultant's report. The memorandum referred to "certain allegations" raised by OSHA, and requested the report to provide the "necessary data to be utilized in defense of the matter." *Martin*, 983 F.2d at 1261. Bally's then refused OSHA's request for a copy of the report claiming that the report was protected by the work product doctrine. Subsequently, OSHA took an adversarial stance, serving Bally's with a subpoena duces tecum and issuing a citation for willfully violating the OSHA records access rule which requires employers to make available certain records. *Id.* at 1259. The court upheld Bally's position determining that the report was prepared in anticipation of litigation because it was commissioned in response to OSHA's inquiry and was based on a concern that either OSHA or the employees would file a lawsuit. *Id.* at 1261.

In so holding, the *Martin* court held that a person's "unilateral belief" that litigation will result is the initial focus of the inquiry into whether the document was prepared "in anticipation of litigation." *Id.* at 1260. However, the preparer's anticipation of litigation must be tempered by objective reasonableness. *Id.* In *Martin*, the internal memoran-

dum by the general counsel exhibited the general counsel's subjective belief that litigation would ensue, which the court concluded was objectively reasonable. *Id.* at 1261.

In the matter at bar, the actions taken by Armstrong after the investigations by the various agencies were initiated are indicative of a subjective belief that litigation may ensue. Specifically, immediately upon receipt of NJDOH's notice to Armstrong that it would be conducting its own independent investigation, Armstrong formed a strategy team, including in-house counsel, and initiated an internal investigation on the alleged presence of PCBs in the ceiling tiles. Def.'s March Letter at 2. Additionally, Armstrong hired outside counsel to provide legal assistance with regard to regulatory issues. *Id.* The team purportedly produced status reports reflecting the strategy of the team, advice of counsel, outstanding questions and issues, and proposed responses to the claims and demands of the agencies and BCCC. *Id.* In some cases, team members took handwritten notes of the discussions at the meetings. *Id.* Such activity, including the involvement of both in-house and outside counsel, is indicia of Armstrong's subjective anticipation of litigation. An internal document submitted to this court for *in camera* inspection supports Armstrong's claim that at that time, it recognized a potentially adversarial relationship with at least one of the investigating agencies. *Id.* at Ex. G.

Furthermore, Armstrong's subjective belief that litigation may ensue was objectively reasonable. After the EPA determined that the tiles were manufactured by Armstrong, in a May 29, 1986 letter, the Director of the Office of Toxic Substances at the EPA reported to the New Jersey Deputy Commissioner of Health that after the evaluation of the scope of the problem and of Armstrong's cooperation, it "will consider then what actions, if any, are necessary." *Id.* at Ex. C. It is logical that Armstrong would have viewed these words as indicative of the prospect of litigation. Additionally, because Armstrong supplied ceiling tiles to BCCC, the allegation contained in the EPA's civil administrative action complaint against BCCC that it "had in use acoustic ceiling tile which contained

PCBs in excess of 50ppm" also gave Armstrong reasonable cause to believe that the prospect of litigation was indeed real. Def.'s March Letter at Ex. E. Not surprisingly, BCCC thereafter sought indemnification from Armstrong, and Armstrong became a party to subsequent settlement discussions between the EPA and BCCC. *Id.* at 3. Armstrong further asserts that despite its remediation efforts, there was disagreement regarding whether a violation had occurred and whether the EPA regulations were applicable to ceiling tiles installed in the early 1970's. *Id.*

Moreover, the prospect of litigation was reasonable given the demands placed upon Armstrong by the NJDOH. Specifically, notes of an April 1, 1986 meeting between Armstrong and a group of the New Jersey environmental and health commissioners submitted to the court for *in camera* inspection reveal that despite Armstrong's lack of knowledge regarding the extent of any potential problem or violation with the ceiling tiles, NJDOH continued to advise Armstrong to commit to engage in recall and remediation projects as well as to fund a state-sponsored assessment program of PCBs in ceiling tiles. *Id.* at Ex. G. Armstrong was given 30–45 days in which to analyze the situation at BCCC before having to take any action to comply with the agency demands. *Id.* In light of the foregoing and the apparent adversarial nature of the relationship between Armstrong and the various agencies, it was objectively reasonable that Armstrong believed that litigation might result.

Although the plaintiffs offer little support in challenging the application of the work product doctrine, they do point out that in *Janicker v. George Washington Univ.*, 94 F.R.D. 648, 650 (D.D.C.1982), the court held: "[t]he mere contingency that litigation may result is not determinative. If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is producible in civil pretrial discovery." In *Janicker*, the university vice-president ordered a committee investigation into a fire that occurred in a building on the George

Washington campus. As a result of the investigation, a committee report was produced as well as an investigative report issued by the university security officer. The court granted the plaintiffs' motion to compel the reports concluding that the reports "were more internal reports prepared in the ordinary course of business with the primary motivation being to determine what steps could be taken to prevent any repetition of such a tragedy to protect other resident college students and the University's standing in the college community and in recruiting students to attend the institution in the future." *Id.* at 650. Leading the *Janicker* court to this decision was a fact that is distinct from the case at bar—here, the production of the documents at issue was ultimately prompted by investigations brought by *external* agencies rather than created as a result of investigations brought pursuant to internal direction as in *Janicker.* Here, because outside parties were involved, it is unlikely that Armstrong's actions and the documents it created as a result were merely done as part of its ordinary course of business.[3]

■■■■ Once the movant meets the burden of showing that the materials were prepared in anticipation of litigation, then the opposing party has the burden of overcoming the protection. *Hickman,* 329 U.S. at 512, 67 S.Ct. at 394; *see In re Grand Jury Investigation,* 599 F.2d 1224, 1230 (3d Cir.1979). In the matter at bar, the plaintiffs have not demonstrated a substantial need for any of the *specific* documents or information in issue or that they are unable to obtain the substantial equivalent of the materials by other means without undue hardship. *See Delco Wire & Cable, Inc. v. Weinberger,* 109 F.R.D. 680 (E.D.Pa.1986). Moreover, although the work product doctrine protects the physical documents, it "does not protect disclosure of the underlying facts in the documents." *Upjohn Co. v. United States,* 449 U.S. 383, 395, 101 S.Ct. 677, 685, 66 L.Ed.2d 584 (1981); *Jaroslawicz,* 115 F.R.D. at 518. Thus, the plaintiffs still have an opportunity to unearth the underlying facts in the documents by other means of fact discovery.

■■■■ Finally, the plaintiffs accuse Armstrong of asserting work product protection in bad faith, as evidenced by the "purely factual" content of a significant number of the documents, and the defendant's failure to "demonstrate how the professional skill and experience of any attorney was implicated in their creation." Pl.'s Letter Br. at 1. Such arguments have no merit. First, a purely factual document is not precluded from qualifying as work product that was prepared in anticipation of litigation. *Martin,* 983 F.2d at 1261. Second, despite the plaintiffs' contention that work product protection is "strictly limited to items obtained or produced by the lawyer which involve his profes-

---

**3.** The plaintiffs do not argue that, even assuming arguendo that the documents at issue were in fact prepared in anticipation of litigation, Armstrong is precluded from proper assertion of the privilege because the documents were not prepared in anticipation of *this* litigation. Despite the absence of such an argument by the plaintiffs, Armstrong nevertheless maintains that the agency investigation related documents are protected by work product privilege for the purposes of *this* present litigation because the agency investigations and the instant case involve the same parties and the same subject matter—the alleged contamination at BCCC. Indeed, in *In re Grand Jury Proceedings,* 604 F.2d at 803, the Third Circuit held that the identity of subject matter is sufficient to meet the "in anticipation of litigation" test, notwithstanding that the materials were prepared for different proceedings, one civil and the other criminal. Similarly, the court in *Leonen,* 135 F.R.D. at 97, concluded that documents prepared in anticipation of prior asbestos litigation were protected by the work product doctrine in the asbestos litigation then before the court because there was a "close connection in parties of subject matter between the two matters." (citing *Jaroslawicz v. Engelhard Corp.,* 115 F.R.D. 515, 517 (D.N.J.1987) (in private securities litigation, corporation's claim of work product protection was upheld where documents were prepared in connection with SEC investigation since the SEC investigation and the litigation before the court focused on the same corporate transactions and thus, are related)). In the case at bar, defendant Armstrong arguably prepared the documents in anticipation of litigation with any of the various agencies. Although the instant suit was brought by individual plaintiffs rather than the agencies, the litigation clearly focuses on the same subject matter, namely the alleged presence of PCBs in Armstrong's ceiling tile at BCCC. Therefore, Armstrong may assert that the documents at issue are protected by the work product doctrine *even if they may have been prepared in anticipation of prior PCB litigation.*

sional skill and expertise," (Pls.' Br. at 1.), the doctrine's application is not limited to materials produced only by lawyers. Rule 26(b)(3) of the Federal Rules of Civil Procedures defines a "representative" expansively, permitting a "consultant, surety, indemnitor, insurer, or agent" to assert the privilege. In fact, in keeping with the language of Rule 26(b)(3), the Third Circuit has expressly rejected the notion that only a lawyer may assert the work product privilege. *In re Grand Jury Proceedings*, 604 F.2d at 801; *see also United Coal Companies v. Powell Constr. Co.*, 839 F.2d 958 (3d Cir.1988). Accordingly, the plaintiffs have failed to adequately overcome the assertion of privilege.[4] Finally, there is nothing in the record that supports the plaintiffs' allegation that Armstrong's assertion of the work product doctrine was in bad faith.

### III. CONCLUSION

Armstrong has demonstrated its subjective belief that litigation with any of the investigating agencies might ensue, and that such belief was objectively reasonable. Thus, this court finds that all documents at issue in this opinion were prepared by Armstrong "in anticipation of litigation," pursuant to Rule 23(b)(3). The plaintiffs have failed to overcome the assertion of the privilege by showing a substantial need for the documents, or an inability to obtain the substantial equivalent of the documents by other means without undue hardship. Consequently, the documents at issue fall within the ambit of the work product doctrine and therefore need not be disclosed.

An appropriate order shall enter this date.

---

4. Rule 26(b)(3) distinguishes between ordinary work product protection, which can be overcome by a showing of "substantial need" and an inability to "obtain the substantial equivalent of the materials by other means" without undue hardship, and opinion work product protection, which protects the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Opinion work product protection is not absolute, but does require a far greater show-