**CONTINENTAL CASUALTY COMPANY, et al.,**
**Plaintiffs,**

v.

**UNDER ARMOUR, INC., Defendant.**

**No. 06 CV 3224 CCB.**

United States District Court,
D. Maryland.

Feb. 13, 2008.

David P. Durbin, D. Stephenson Schwinn, Jordan Coyne and Savits LLP, Washington, DC, Arthur J. Mccolgan, II, Ryan M. Henderson, Walker Wilcox Matousek LLP, Chicago, IL, for Plaintiffs.

Michael Thomas Sharkey, Andrew M. Weiner, Dickstein Shapiro LLP, Washington, DC, for Defendant.

## MEMORANDUM AND OPINION

PAUL W. GRIMM, United States Magistrate Judge.

In this declaratory judgment action, three insurance companies, Continental Casualty Company, Transcontinental Insurance Company, and Valley Forge In-

surance Company, collectively referred to as "CNA", sued their insured, Under Armour, Inc., seeking a determination that, under a series of insurance policies issued to Under Armour, they are obligated neither to defend nor indemnify it in connection with litigation brought against Under Armour by two other companies, Topolewski America Inc., and Metal Jeans, Inc. The case has been assigned to me to resolve all discovery disputes. Paper No. 33. The pending dispute involves Under Armour's motion for a ruling regarding what use, if any, it may make of a .pdf file it received from its independent insurance broker, Frenkel and Company, ("Frenkel") containing copies of claims notes allegedly containing attorney client privileged and work product protected communications from CNA's counsel, which erroneously had been posted in the wrong location by the CNA claims specialist assigned to the Under Armour claim on a CNA website, cnacentral.com. Frenkel was authorized by CNA to access and read the claims notes for "its own individual use" by a Terms of Service Agreement it entered into with CNA. As to these allegedly privileged and protected materials, Under Armour contends that neither the attorney client privilege nor work product doctrine is applicable, or, if applicable, that they have been waived. CNA asserts that the claims notes at issue are privileged and protected, and that there has been no waiver.

The motion has been fully briefed in Papers No. 27, 28, 29, 39, and 40, and the parties have stipulated that Maryland law governs, Paper No. 37. On January 14, 2008, a hearing was held in court during which I assumed, without deciding, that the claims notes at issue were both privileged and work product protected, but ruled that both the privilege and protection had been waived, Paper No. 41. Although I fully explained the basis for my ruling during the hearing, I reserved the right to supplement the ruling with a written memorandum and opinion, to provide guidance to counsel in other cases regarding the recurring difficult issues raised by this dispute. This memorandum and order serves this purpose.

## Background

CNA issued four insurance policies to Under Armour—two general liability policies and two umbrella policies. Compl., Paper No. 1, ¶ 19. In February 2006, Under Armour was sued by two Nevada corporations, Topolewski America, Inc., and Metal Jeans, Inc., in the United States District Court for the Central District of California. Compl., Paper No. 1, ¶¶ 9–10. The lawsuit asserted multiple causes of action, including allegations that Under Armour had infringed trademarks held by Topolewski and Metal, and was selling clothing and accessories under a logo that was confusingly similar to their own. *Id.* at ¶ 11. The lawsuit sought both injunctive and monetary relief. After it was served, Under Armour put CNA on notice of the suit and requested that CNA undertake its defense, and indemnify it in the event that it was found liable.

CNA assigned Under Armour's coverage claim to James J. Hoefer, a claims consultant, Aff. of James Hoefer, Ex. B, ¶¶ 3–4, Pls.' Resp. to Def.'s Mot., Paper No. 28 (hereinafter "Hoefer Aff. at ___"), who coordinated with in-house claims counsel, (referred to in CNA's claims file as "CLEM counsel") and outside coverage counsel. As he worked on the coverage issues, Hoefer posted claims notes memorializing his actions, including summaries and copies of communications with CLEM counsel and coverage counsel, on a website, cnacentral.com, a web-based program designed to permit independent insurance brokers who sell CNA products to quote and request issuance of policies for their clients, and thereafter to track claims for coverage once the insurance has been is-

sued. Aff. of Nancy Stoecker, Ex. A. ¶¶ 4–5, 13, Pls.' Resp. to Def.'s Mot., Paper No. 28 (hereinafter "Stoecker Aff. at ___").

Under Armour purchased the policies from CNA by using such an independent insurance broker, Frenkel and Co. When the Topolewski suit was filed, Michael Peace, a senior claims consultant at Frenkel, was assigned to monitor the suit and CNA's response to Under Armour's coverage claim. CNA had provided Frenkel with access to its cnacentral.com website, issuing it a password, account number and login ID to facilitate its monitoring the claims notes posted on the website pertaining to the Under Armour coverage claim. Aff. of Michael Peace, ¶¶ 5–11, attached to Under Armour's Mem. in Supp. of its Mot. for a Ruling on the Use of the Claims Notes, Paper No. 27 (hereinafter "Peace Aff. at ___"). Prior to receiving this access, Frenkel signed a Terms of Service Agreement with CNA in which it agreed, *inter alia,* to "visit, view and to retain a single copy of pages of this Site solely for [its] . . . own individual use". Ex. C, Paper No. 28, CNA's Resp. to Under Armour's Mot.

To monitor the handling of Under Armour's coverage claim, Peace accessed the cnacentral.com website and reviewed claims notes posted by Hoefer. In December 2006, when he received notice from CNA that it had determined to deny Under Armour a defense and file a declaratory judgment action, he exchanged email with Hoefer in which he referenced the earlier claims notes he had read, and questioned why CNA had decided to disclaim coverage when it previously had been proceeding in the direction of providing Under Armour with a defense, under a reservation of rights. Peace Aff. at ¶ 16–17. Unbeknownst to Peace, Hoefer was supposed to have designated privileged and protected communications from counsel as confidential before he posted them on the cnacentral.com website, by selecting a "button" on the computer that would not post them to the portion of the site to which Peace had access, but rather to a restricted portion of the website. Hoefer Aff. at ¶¶ 9–11, Stoeker Aff. at ¶¶ 14–16. Hoefer inadvertently neglected to designate the privileged and protected material as confidential when he posted it to cnacentral.com.

With regard to the specific claims entries that are the subject of the pending motion, Hoefer summarized communications he had with CLEM and coverage counsel in his cnacentral.com claim notes, and also attached copies of email communications from them as well. Hoefer posted a minimum of eight potentially privileged and protected entries on the website on August 17, 2006 (multiple postings), September 12, 2006, November 17, 2006, and November 22, 2006 (multiple postings).[1] When Hoefer notified Peace that CNA had disclaimed coverage and decided to file a declaratory judgment action, Peace prepared a .pdf file containing the above referenced postings, and provided them to Under Armour. Peace Aff. at ¶ 12. Under Armour, in turn, provided the .pdf to the attorneys representing it in this action. When they reviewed the file and determined that it appeared to contain entries that could be privileged or protected, they ceased reading further, and notified counsel for CNA on July 10, 2007. Ex. D, Paper No. 28, CNA Resp. to Under Armour's Mot. In response, on July 11, 2007, counsel for CNA replied, asserting that the claims notes included attorney client privileged and work product protected communications, and denying that these

---

1. Because the exhibits to the motions papers remain sealed until the final resolution of the pending motion, including any objections filed to the rulings by the undersigned, this memorandum will describe them only in general terms.

protections had been waived. Ex. E. Paper No. 28, CNA Resp. to Under Armour's Mot.[2] This motion followed.

### Discussion

#### 1. Waiver of the Attorney Client Privilege by Inadvertent Disclosure

As noted, CNA argues that the entries at issue are attorney client privileged and work product protected, and that Hoefer's inadvertent posting of them on the cnacentral.com website did not waive either protection, inasmuch as CNA took prompt action to assert the privilege and protection as soon as it learned of the inadvertent postings. Under Armour disputes the applicability of either the privilege or work product protection, but argues, alternatively, that even if privileged and protected when created, these protections were waived. Of the two issues, the privilege one is the more easily resolved, and will be addressed first.

] Although this is a declaratory judgment action filed pursuant to 28 U.S.C. § 2201 (2000), this court's underlying jurisdiction lies in diversity of citizenship, pursuant to 28 U.S.C. § 1332 (2000), *See Volvo Const. Equip N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir.2004) (holding "a federal court may properly exercise jurisdiction in a declaratory judgment proceeding when three essentials are met: (1) the complaint alleges an 'actual controversy' between the parties 'of sufficient immediacy and reality to warrant issuance of a declaratory judgment;'

(2) the court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction."). As noted, counsel have stipulated that in this diversity of citizenship declaratory judgment action seeking an interpretation of four insurance policies, Maryland law governs. Paper No. 37. Further, Fed. R. of Evid. 501 states:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. *However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.*

(emphasis added). Accordingly, Maryland law governing applicability and waiver of the attorney client privilege supplies the rule of decision. *F.H. Chase v. Clark/Gilford*, 341 F.Supp.2d 562, 563 (D.Md.2004) (finding that Maryland law governed whether inadvertent production waived attorney client privilege in a diversity breach of contract case)[3]. In *Elkton*

---

**2.** As noted during the hearing, when dealing with each other in connection with this sensitive and important issue, counsel for both Under Armour and CNA acted with the utmost professionalism and courtesy in their correspondence and their court filings. Disputes such as these can tend to bring out the worst in counsel, prompting accusations of unethical and unprofessional behavior, and counter allegations of incompetence or care-

lessness. Such behavior was entirely absent here, where the disagreements were on the merits, and not *ad hominem*.

**3.** The application of Fed.R.Evid. 501 in civil cases can be tricky. It is easiest to do where it is clear that either federal or state law governs the privilege determination. Where both federal and state substantive law is applicable, such as a federal question case with

supplemental state law claims, Rule 501 would seem to require that federal privilege law control the federal claims, and state privilege law control the supplemental state law claims. Of course, in instances where both the federal and state privilege law is the same, there is no practical difficulty. However, sometimes the federal and state law is different. An example of this lies in the issue presented in this case. As discussed above, Maryland has adopted the intermediate of the three approaches to determining the result of an inadvertent disclosure of attorney client information. *Elkton Care Ctr. Assocs. Ltd. P'ship v. Quality Care Mgmt.*, 145 Md.App. 532, 543–45, 805 A.2d 1177 (2002). However, the Fourth Circuit Court of Appeals has not yet ruled on which of the three approaches should be followed. There are district court cases within the Fourth Circuit that have adopted the same intermediate approach as the Maryland Court of Special Appeals, see e.g. *McCafferty's, Inc. v. The Bank of Glen Burnie*, 179 F.R.D. 163 (D.Md.1998) (adopting the intermediate approach, and citing other district court cases within the Fourth Circuit that have done so). However, other district courts have questioned whether the Fourth Circuit, if called upon to address this issue, would adopt the intermediate test, see, e.g., *F.C. Cycles Int'l v. Fila Sport*, 184 F.R.D. 64, 76 (1998), and a recent examination of Fourth Circuit law regarding waiver of the attorney client privilege concluded that, based on its past decisions, the circuit was closely aligned with decisions from other jurisdictions that have adopted the harshest of the three approaches to inadvertent disclosure of privileged information—namely that such disclosure waives the privilege. *See, e.g. Hopson v. Mayor and City Council of Baltimore*, 232 F.R.D. 228, 237–38, (D.Md.2005) (noting that Fourth Circuit cases appear to interpret the attorney client privilege very strictly, and appear to favor the "strict liability" approach to inadvertent disclosure of privileged information, under which waiver is the consequence of such disclosure). If a civil case in federal court contains claims governed by both federal and state substantive law, what law should the court apply when the federal privilege law is different from the state privilege law? This is a complex question, but it appears that the majority of courts that have faced it have held that federal privilege law trumps state law, because were it otherwise, the jury would be faced with a hopelessly confusing task. *See, e.g., Hancock v. Hobbs*, 967 F.2d 462, 466–67

(11th Cir.1992) (applying federal rule of privilege to both federal and state claims and finding that "it also would be impractical to apply two different rules of privilege to the same evidence before a single jury."); *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir.1992) (holding that the existence of pendent state claim did not relieve the Court of its obligation to apply the federal law of privilege); *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 104 (3d Cir.1982) (holding "that when there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility ... is the controlling rule."); *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir.1987) (holding that federal law controlled question of privilege where federal civil RICO claims were joined with state law claims); *Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.*, 174 F.R.D. 609, 632 (M.D.Pa.1997) ("In a federal question case with supplemental state law claims, the federal law of privileges governs the entire case."); *In re Combustion, Inc.*, 161 F.R.D. 51, 54 (W.D.La.1995) (holding that "the federal law of privilege provides the rule of decision with respect to privilege issues affecting the discoverability of evidence in this federal question case involving pendent state law claims."; this result is consistent with "the general policies of the federal rules favoring uniformity and simplicity"); *Tucker v. United States*, 143 F.Supp.2d 619, 622–25 (S.D.W.Va.2001) (finding federal privilege law, not state privilege law, applied to both FTCA and pendent state law claims in medical malpractice case); *Syposs v. United States*, 179 F.R.D. 406, 411 (W.D.N.Y.1998) (finding medical malpractice claim under the FTCA is a federal question case and therefore the federal common law of privileges applies). *But see Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1368–69 (10th Cir.1997) (suggesting that in case involving both federal claims and pendent state claims, "both bodies" of privilege law should be considered); *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir.1995) (case involving federal and state claims; suggesting that for state claims, state law of privilege should apply); *Ellis v. United States*, 922 F.Supp. 539, 540 (D.Utah 1996) (finding the case does not involve a federal question and that Utah law, not federal law, "determines the applicable clergy privilege."), 2 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual 501–9 (8th ed. 2002) ("We note that most Courts, when confronted with this question, have held that the federal law of privilege applies to both the

*Care Center Associates, Ltd. Partnership v. Quality Care Management,* 145 Md. App. 532, 805 A.2d 1177 (2002), the Maryland Court of Special Appeals surveyed the law relating to inadvertent waiver of the attorney client privilege, noting that three distinct approaches had been followed by courts within the United States: a strict waiver approach, finding waiver whenever a non-privileged disclosure occurs; a lenient approach, finding waiver only in the instance of an intentional waiver by the holder of the privilege; and an intermediate approach, which considers multiple factors to determine whether a waiver should be found. *Elkton Care,* 145 Md.App. at 544–45, 805 A.2d 1177. The court adopted the intermediate approach, which requires a court to consider: " '(1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the ... production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosure; and (5) whether the overriding interests of justice would or would not be served by relieving a party of its error.' " *Id.* Applying these factors to the present case compels the conclusion that the privilege has been waived by the inadvertent posting of the privileged communications on cnacentral.com. First, CNA failed to take sufficient precautions to prevent the inadvertent disclosure of the privileged information. Despite the existence of a recognized procedure to mark such communications "confidential"—with a simple "mouse click"—at the time of their creation, Mr. Hoefer, an experienced claims consultant, repeatedly posted email from CLEM and coverage counsel containing their analysis of the coverage issues, as well as posting entries paraphrasing their views. There were multiple postings over an extended period of time—from August 18, 2006 through November 22, 2006. The repetitive failure to adhere to the established policy demonstrates that reasonable precautions were not taken. Second, there were a minimum of eight privileged communications posted, during this extended period, hardly a one-time occurrence. Third, the disclosure was extensive, outlining the very rationale for abandoning what appeared to be the initial decision to provide Under Armour with a defense under a reservation of rights, in favor of a decision to deny any coverage—defense or indemnification—and file a declaratory judgment action. Fourth, while counsel for CNA responded immediately after notification by counsel for Under Armour that it had received the .pdf file and that it appeared to contain privileged communications, this does not vitiate the fact that this action took place in July, 2007. The postings on the website remained there from their inception, between August and November, 2006, despite the fact that Mr. Hoefer must have reviewed the website many times during that period, yet evidently never realized what should have been immediately apparent—he had forgotten to designate the information as confidential and posted it where it could be read by third parties, including Under Armour's insurance broker. Finally, the record is devoid of any facts that would indicate that there is any overriding interest of justice that would be served by relieving CNA of the consequences of its error. The disclosure was a result of the voluntary, albeit inadvertent, acts by Mr. Hoefer, and not because

federal claim and to the pendent state claim."). In this case, the underlying jurisdiction of this court is diversity of citizenship, and the parties have agreed that Maryland substantive law is controlling. Accordingly, because this case presents only state law claims, federal privilege law is inapplicable, and the Court is not called upon to select between potentially competing versions of the law of privilege.

of any wrongdoing by Under Armour, or its insurance broker, Mr. Peace of Frenkel and Co.

In this regard, CNA argues that Peace violated the Terms of Service agreement for use of the cnacentral.com website, because that agreement restricted access to the site "solely for [Frenkel's] ... own individual use", and prohibited him from duplicating, downloading, publishing, or otherwise distributing any material on the site for "any purpose other than for [Frenkel's] ... own individual use". See Ex. C, Paper No. 28, CNA's Resp. to Under Armour's Mot. This argument is unpersuasive. First, the Terms of Service agreement, which CNA drafted, does not define "own individual use", and it must be read in the context of the entire agreement, and given a reasonable interpretation. As the Stoecker and Peace affidavits show, CNA permits independent insurance brokers access to the cnacentral.com website to enable them to determine premium costs and underwrite CNA insurance policies, and, once issued, to monitor claims relating to policies that have been issued to their clients by CNA. Peace's access to the website was entirely consistent with that permitted purpose. Further, it is clear that Frenkel and Co., as an independent insurance broker, owed a duty towards its client, which was Under Armour, not CNA. Indeed, Frenkel's website, http://www.frenkel.com, the contents of which this court judicially noticed pursuant to Fed.R.Evid. 201, make it clear that as part of their services to their clients they "meet regularly with the insurance companies that assume your specific business risks, *and navigate a claims process that can be tedious* in hard and soft markets alike". *See* Frenkel & Co, Inc., http://www.cosmeticinsurance.com, (last visited Feb. 12, 2008) (emphasis added). Moreover, the courts of Maryland long have held that an insurance broker is an agent of its principal the entity that is seeking insurance, not the company issuing the policy. *Am. Cas. Co. of Reading v. Ricas,* 179 Md. 627, 631, 22 A.2d 484 (1941) ("Ordinarily, the relation between the insured and the broker is that between principal and agent. An insurance broker is ordinarily employed by a person seeking insurance, and when so employed, is to be distinguished from [the] ordinary insurance agent, who is employed by insurance companies to solicit and write insurance by, and in the company."); *Cooper v. Berkshire Life Ins. Co.,* 148 Md.App. 41, 83, 810 A.2d 1045 (2002) ("[I]nsurance agents and brokers clearly owe a professional's duty to the insured. 'An agent, employed to effect insurance, must exercise such reasonable skill and ordinary diligence as may fairly be expected from a person in his profession or situation, in doing what is necessary to effect a policy, in seeing that it effectually covers the property to be insured, in selecting the insurer and so on'.... The failure to meet that duty allows a recovery in tort.") (internal citations omitted). It would be disingenuous. of CNA to suggest that Frenkel had any need for "individual use" of the cnacentral.com website claims notes relating to the suit filed against Under Armour by Topolewski America Inc. for any purpose other than to learn information regarding the status of Under Armour's demand for coverage from CNA, which it had a legal duty to report to Under Armour. Any other reading of the language of the agreement would produce an absurd result. Similarly, the Terms of Service agreement permitted Frenkel to "download, publish, modify or otherwise distribute any material on [the cnacentral.com] Site" for the same "individual use", which by necessity permitted its disclosure to Under Armour. Accordingly, I find no merit in CNA's argument that Peace's downloading to a .pdf file the contents of the cnacentral.com claims file relating to Under Armour's

claim and thereafter providing it to Under Armour, its principal, was in violation of the Terms of Service Agreement. Accordingly, I find that the attorney client privilege has been waived as to the materials posted on cnacentral.com.[4]

### 2. Waiver of Work Product Protection By Disclosure to An Adverse Party

■■■■] The conclusion that the attorney client privilege has been waived as to the claims notes as a result of their inadvertent disclosure to Frenkel and Under Armour does not concomitantly compel the conclusion that they also have lost work product immunity.[5] This is because:

> [t]he waiver of the attorney-client privilege for a communication does not automatically waive whatever work-product immunity that communication may also enjoy, as the two are independent and grounded on different policies. Waiver of the privilege should always be analyzed distinctly from waiver of work product, since the privilege is that of the client and the work product essentially protects the attorney's work and mental impressions from adversaries and third parties even when communicated to the client.

Edna S. Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine* 608 (4th ed.2001). Because the work product doctrine is not a privilege, but rather a qualified immunity from discovery,[6] Fed.

R.Evid. 501 is inapplicable, and Maryland law does not govern this waiver issue. Rather, federal law does, even though jurisdiction in this case is bottomed on diversity of citizenship. *United Coal Cos. v. Powell Constr.*, 839 F.2d 958, 966 (3d Cir. 1988) (unlike the attorney client privilege, the work product doctrine is governed, even in diversity cases, by federal law); *Coregis Ins. Co. v. Law Offices of Carole F. Kafrissen, P.C.* 57 Fed.Appx. 58, 60 (3d Cir.2003) (federal—not state—standard applied in determining scope of work product privilege in diversity case); *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 472 (6th Cir.2006) ("In a diversity case, the court applies federal law to resolve work product claims and state law to resolve attorney-client claims."); *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1053 (8th Cir.2000) (federal courts apply state law to resolve attorney client privilege issues and federal law to resolve work product issues in diversity cases); *Frontier Ref. Inc. v. Gorman–Rupp Co.*, 136 F.3d 695, 702 n. 10 (10th Cir.1998) ("[u]nlike the attorney client privilege, the work product [doctrine] is governed, even in diversity cases, by a uniform federal standard embodied in Fed.R.Civ.P. 26(b)(3)."); *Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. 96, 105 (S.D.N.Y.2007) ("While state law governs the question of attorney-client privilege in a diversity action, federal law governs the applicability of the work product doctrine."); *Schipp v. Gen. Motors*

---

**4.** Under Armour's motion only seeks a ruling by the Court regarding what use, if any, it may make of the privileged and protected information posted on cnacentral.com. It has neither argued nor briefed the issue of whether the disclosure amounted to subject matter waiver of the attorney client privilege. Because this issue is not before the Court, this ruling addresses only the privileged materials actually posted and nothing more.

**5.** As I did with the attorney client analysis, I have assumed, without deciding, that the

claims notes at issue would qualify as attorney opinion work product.

**6.** *Musselman v. Phillips*, 176 F.R.D. 194, 195 n. 1 (D.Md.1997) (collecting authority); *Nutramax Labs., Inc. v. Twin Laboratories Inc.*, 183 F.R.D. 458, 463, n. 8 (D.Md.1998); 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure: Civil 2d § 2023 at 335 (2d ed.1994)(work product materials are not beyond the scope of discovery on grounds of "privilege").

*Corp.,* 457 F. Supp 2d 917, 923 (E.D.Ark. 2006) ("In a diversity case, the Court applies federal law to resolve work product claims."); *Bank of the West v. Valley Nat. Bank of Ariz.,* 132 F.R.D. 250 (N.D.Cal. 1990) (in diversity action, California law would govern resolution of issues arising out of plaintiff's invocation of attorney client privilege whereas work product issues would be resolved under federal law); *Nicholas v. Bituminous Cas. Corp.,* 235 F.R.D. 325, 329 n. 2 (N.D.W.Va.2006) ("In a diversity case, federal courts apply federal law to resolve work-product privilege claims and state law to resolve attorney-client privilege claims."); *Maertin v. Armstrong World Industries, Inc.,* 172 F.R.D. 143, 147 (D.N.J.1997) ("[T]he work product privilege is governed, even in diversity cases, by uniform federal law..."); *S.D. Warren Co. v. E. Elect. Corp.,* 201 F.R.D. 280, 281 (D.Me.2001) (federal courts apply federal law when addressing the work product doctrine, even in diversity cases lacking any federal question); 8 Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d. § 2023 (2d ed. 1994) ("At least since the adoption of Rule 26(b)(3) in 1970, it has been clear that in federal court the question whether material is protected as work product is governed by federal law even if the case is in court solely on grounds of diversity of citizenship.")[7].

CNA contends that, under Fourth Circuit authority, opinion work product, such as the email from coverage and CLEM counsel and Hoefer's characterization of their legal analysis, is afforded particularly robust protection, being viewed as "absolutely immune" or "nearly absolutely immune" from discovery[8]. No one can quarrel with this point, but it is irrelevant. Under Armour does not seek discovery pursuant to Fed.R.Civ.P. 34 of the claims notes that Hoefer posted on cnacentral.com. They were obtained by Under Armour from its insurance broker, Frenkel, entirely outside of the discovery process. The issue presented in this case is not whether the opinion work product contained in the claims notes can be discovered, but whether its inadvertent posting prior to the filing of this lawsuit on a website to which CNA's adversary, Under Armour, had been given access, waives work product protection. And, as will be

---

7. However, the result almost certainly would be the same even if Maryland law controlled. In Maryland, the work product doctrine has been codified at Maryland Rule 2–402(d), the text of which is substantially identical to Fed. R.Civ.P. 26(b)(3). Moreover, Maryland courts long have cited federal cases when ruling on issues involving the work product doctrine in state cases. *See, e.g. Balt. Transit Co. v. Mezzanotti,* 227 Md. 8, 14 n. 2, 174 A.2d 768 (citing *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) as authority in interpreting the work product doctrine under Maryland law); *E.I. du Pont de Nemours & Co. v. Forma–Pack Inc.,* 351 Md. 396, 407, 718 A.2d 1129 (1998) (citing federal law in interpreting work product doctrine under Maryland law); *Gallagher v. Office of the Att'y Gen.,* 141 Md.App. 664, 677, 787 A.2d 777 (2001) (citing federal cases in evaluating whether, under Maryland law, work product protection had been waived); *Elkton Care,* 145 Md.App. at 543, 805 A.2d 1177 (citing federal case law in determining whether, under Maryland law, work product protection had been waived); *DeVetter v. Alex. Brown Mgmt. Svcs., Inc.,* No. 24–C–03–007514, 2006 WL 1314014, at * 11 (Md.Cir.Ct. Mar.22, 2006) (citing federal case law in deciding issue of whether work product protection was waived, under Maryland law).

8. *See, e.g. In re Allen,* 106 F.3d 582, 607 (4th Cir.1997) (opinion work product enjoys "nearly absolute" immunity from discovery); *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.,* 967 F.2d 980, 984 (4th Cir.1992) (opinion work product "absolutely immune" from discovery); *Nutramax Labs., Inc. v. Twin Labs., Inc.* 183 F.R.D. 458, 462 (D.Md.1998) (under Fourth Circuit case law opinion work product has [been] characterized variously as "absolutely immune" or "nearly absolutely immune" from discovery, collecting cases).

seen, the Fourth Circuit clearly has recognized that opinion work product protection, however exalted and immune from discovery, may nonetheless be waived.

In *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215 (4th Cir.1976), the Fourth Circuit held that work product protected information that had been produced either voluntarily or inadvertently to an adversary did not result in subject matter waiver, as would be the case for attorney client privileged materials. The court summarized its holding as follows:

> Thus, to the extent that a concept of subject matter waiver is applicable to Rule 26(b)(3) under the rationale of the *Nobles* [9] case which held that testimonial use of work product constituted waiver, we are of [the] opinion it does not extend to a case such as this where there has been only inadvertent or partial disclosure in response to specific inquires, and in which no testimonial use has been made of the work product.

*Duplan*, 540 F.2d at 1223. Of course, the subject of the *Duplan* case was the *extent* to which the inadvertent or partial production constituted a waiver, and if so, whether additional discovery of protected materials was warranted. It did not attempt a comprehensive analysis of the underlying circumstances that would trigger a waiver in the first instance. Implicit in the conclusion that broad subject matter waiver did not apply to opinion work product is an acknowledgment that the inadvertent production of opinion work product could result in more limited waiver, as to the materials actually produced. This concept was clarified further by the Court in *Martin Marietta Corp. v. Pollard*, 856 F.2d 619, 626 (4th Cir.1988), where it stated:

> First and most generally, opinion work product is to be accorded great protec-

tion by the courts. While certainly *actual disclosure of pure mental impressions may be deemed waiver*, and while conceivably there may be indirect waiver in extreme circumstances, we think generally such work product is not subject to discovery.

(emphasis added). The Fourth Circuit more comprehensively addressed the circumstances that could result in the waiver of opinion work product protection in *Doe v. United States*, 662 F.2d 1073, 1081 (4th Cir.1981), where it ruled:

> Recent decisions considering [waiver of work product protection] ... have focused on a concern inherent in the work product rule: that since an attorney's work is for his client's advantage, opposing counsel or adverse parties should not gain the use of that work through discovery. The attorney and client can forfeit this advantage, but their actions effecting the forfeiture or waiver must be consistent with a conscious disregard of the advantage that is otherwise protected by the work product rule. Disclosure to a person with an interest common to that of the attorney or the client normally is not inconsistent with an intent to invoke the work product doctrine's protection and would not amount to such a waiver. However, when an attorney freely and voluntarily discloses the contents of otherwise protected work product to someone with interests adverse to his or those of the client, knowingly increasing the possibility that an opponent will obtain and use the material, he may be deemed to have waived work product protection .... Additionally, release of otherwise protected material without an intent to limit its future disposition might forfeit work product

---

**9.** Referring to *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

protection, regardless of the relationship between the attorney [sic] and the recipient of the material. *In other words, to effect a forfeiture of work product protection by waiver, disclosure must occur in circumstances in which the attorney cannot reasonably expect to limit the future use of the otherwise protected material.* (emphasis added).

■ The notion that disclosure of work product protected material in a manner that creates a substantial risk that it will be received by an adversary waives the protection because it cannot be expected that the future use of the information could be limited is a common sense proposition that has been recognized by other courts and commentators for the simple reason that once an adversary has become aware of the content of the information disclosed it cannot purge it from its mind. This principle has been stated authoritatively as follows: "Work-product immunity is waived if the client, the client's lawyer, or another authorized agent of the client: ... (4) discloses the material to third persons in circumstances in which there is a significant likelihood that an adversary or potential adversary in anticipated litigation will obtain it." Restatement (Third) of the Law Governing Lawyers § 91 (2000). The notion is that failure to take adequate precautions to prevent an adversary from obtaining work product information warrants waiver because "[i]ndifference to such a consequence indicates that protection of the immunity was not important to the person claiming the protection." § 91 cmt. b. Further, as long as the disclosure was voluntary, waiver results, even if it was not consensual. § 91, cmt. a ("Most decided cases of waiver involve actions of the attorney or client that are voluntary, but not explicitly consensual."). *See, e.g. GAF Corp. v. Eastman Kodak Co.*, 85 F.R.D. 46, 51–52 (D.C.N.Y.1979), *abrogated on other grounds by In re Steinhardt Partners*, 9 F.3d 230, 233 (2d Cir.1993) ("The majority rule provides that disclosure of the privileged information by the party asserting the attorney work product privilege to a third-party does not constitute waiver unless such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary. Therefore, only if such disclosure substantially increases the possibility that an opposing party could obtain the information disclosed will the disclosing party's work product privilege be deemed waived. This majority rule reflects the purpose of the work product privilege which is to prevent an opposing party from securing the protected information rather than to prevent the outside world generally from obtaining the information.") (internal citations omitted); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 125 F.R.D. 578, 587 (N.D.N.Y.1989) ("[W]ork product protection is waived when protected materials are disclosed in a manner which 'substantially increases the opportunity for potential adversaries to obtain the information' ".); *Carter v. Gibbs*, 909 F.2d 1450, 1451 (Fed.Cir.1990) (Fed.Cir.1990) (en banc), *superseded in non-relevant part.* Pub.L. No. 103–424, § 9(c). 108 Stat. 4361 (1994), as recognized in *Mudge v. United States*, 308 F.3d 1220, 1223 (Fed. Cir.2002) ("Assuming the motion to strike asserts the work product as well as the attorney-client privilege, we believe the government has waived the former by voluntarily attaching a copy of the offending memorandum to appellants' copy of the motion for an extension of time. It is irrelevant whether the attachment was inadvertent, as the government alleges. Voluntary disclosure of attorney work product to an adversary in the litigation for which the attorney produced that information defeats the policy underlying

the privilege."); *Frank Betz Assocs., Inc. v. Jim Walter Homes, Inc.,* 226 F.R.D. 533, 535 (D.S.C.2005) (finding that "courts generally find a waiver of the work product privilege only if the disclosure substantially increases the opportunity for potential adversaries to obtain the information.") (quoting *In re Grand Jury,* 561 F.Supp. 1247, 1257 (E.D.N.Y.1982)) (internal quotations omitted); 8 Wright, Miller & Marcus, Federal Practice and Procedure; Civil 2d § 2024 at 369 (2d ed. 1994) ("Thus, the result should be that disclosure of a document to third persons does not waive the work-product immunity unless it has substantially increased the opportunities for potential adversaries to obtain the information."); 6 James Wm. Moore, *et al., Moore's Federal Practice* § 26.70[6][c] (3d ed.2004) at 26–167 ("Because the work product privilege is intended to protect the adversary process, some cases draw a distinction between disclosures made to non-adversaries and disclosures made to adversaries. While disclosures made to non-adversaries do not necessarily waive the work product privilege, a disclosure only to one adversary waives the privilege as against all other adversaries. Furthermore, a party may not avoid waiver by asserting the retention of the privilege while at the same time disclosing the material to the adversary.").

■■ In this case, CNA's disclosures of the opinion work product of its CLEM and coverage counsel was made to Michael Peace of Frenkel and Co, who was Under Armour's agent. Disclosure to an agent is tantamount to disclosure to the principal. See *Mut. Life Ins. Co. of New York v. Hilton–Green,* 241 U.S. 613, 622, 36 S.Ct. 676, 60 L.Ed. 1202 (1916) ("The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest."); Restatement (Second) of Agency § 278 (1958) ("The principal is affected by the knowledge which the agent has when acting for him or, if it is the duty of the agent to communicate the information and not otherwise to act, the principal is affected after the lapse of such time as is reasonable for its communication."). Accordingly, by disclosing the content of protected opinion work product to its adversary—Under Armour—CNA cannot now maintain that the protection continues to exist. As a matter of law the protection has been waived. As a practical matter, no other result makes sense. CNA cannot expect to limit the future use by Under Armour of the protected material it disclosed. Neither Under Armour nor its counsel can purge from their consciousness this information that they received not through any wrongdoing of their own but, rather, as a result of the voluntary, though inadvertent, action of CNA. See Edna Selan Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine* 615 (2001) ("[Q]uite obviously, the bell of disclosure cannot be 'unrung' here. In the attorney-client privilege area, a court can order that the privileged communication cannot be used as evidence. There is *no* way for a court, however, to wipe from an adversary's mind any mental impressions or litigation strategy that may have been disclosed.").

The remaining issue to be addressed is the scope of the waiver. As stated above, the Fourth Circuit has recognized that when work product protection has been waived, it is limited to the information actually disclosed, not subject matter waiver. *See Duplan,* 540 F.2d at 1223; Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine* 612 (2001) ("[I]nadvertant or even intentional disclosure of work-product documents will not necessarily constitute waiver as to all such

documents."); 6 James Wm. Moore, *et al.*, *Moore's Federal Practice* § 26.70[6][c] (3d ed.2004) at 26–467 ("A waiver of work-product protection encompasses only the items actually disclosed. Thus, disclosure of some documents does not imply that work product protection has been destroyed for other documents of the same character.").

Having found that both the attorney client privilege and work product protection have been waived as to the claims notes posted by Mr. Hoefer on cnacentral.com, CNA is at liberty to use those materials, to the extent that they are relevant and otherwise admissible in the pending lawsuit.